Jeffry A. Davis (SBN 103299)
Joseph R. Dunn (SBN 238069)
Abigail V. O'Brient (SBN 265704)
**MINTZ LEVIN COHN FERRIS GLOVSKY AND POPEO P.C**.
3580 Carmel Mountain Road, Suite 300
San Diego, CA 92130
Tel: 858 314-1500
Fax: 858 314-1501

Proposed Attorneys for Debtor in Possession
Los Gatos Hotel Corporation

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| In re | Case No. 10-63135 |
| LOS GATOS HOTEL CORPORATION, | Chapter 11 |
| Debtor in Possession. | **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEBTOR'S FIRST DAY MOTION FOR ORDER (A) PROHIBITING UTILITY PROVIDERS FROM ALTERING, REFUSING OR DISCONTINUING SERVICE, (B) DEEMING UTILITIES ADEQUATELY ASSURED OF FUTURE PERFORMANCE AND (C) APPROVING ADEQUATE ASSURANCE PROCEDURES** |
| | Date: TBD<br>Time: TBD<br>Judge: Arthur S. Weissbrodt |

Los Gatos Hotel Corporation, debtor and debtor in possession in the above-captioned chapter 11 case (the "Debtor"), submits this memorandum of points and authorities in support of its Emergency Motion for Order (a) Prohibiting Utility Providers from Altering, Refusing or Discontinuing Service, (b) Deeming Utilities Adequately Assured of Future Performance and (c) Approving Adequate Assurance Procedures (the "Motion"). In support of the Motion, the Debtor states as follows:

# I.

# SUMMARY OF MOTION AND NEED FOR EMERGENCY RELIEF

The Debtor is the owner of Hotel Los Gatos (the "Hotel"), a 72-room boutique hotel located in downtown Los Gatos that also contains a spa and restaurant. In order to serve the needs of its guests, the Hotel requires utility services, including electricity, water, natural gas, telephone and television. Any interruption in utility service will significantly harm the continued operation of the Hotel and the Debtor's prospects for a successful reorganization. Section 366 permits a utility to alter, refuse or discontinue service twenty (20) days after the commencement of a case—before the Motion may be heard on regular notice. Therefore, cause exists to grant the requested relief on an emergency basis.

# II.

# STATEMENT OF FACTS

A. **General Description of the Debtor.**

Los Gatos Hotel Corporation, a California corporation (the "Debtor"), was formed in 2000 to build and operate Hotel Los Gatos (the "Hotel"), a full-service boutique hotel located in downtown Los Gatos, California. The Hotel, constructed in 2002, offers 72 guest rooms, over 2,000 square feet of meeting and conference space, a Michelin star restaurant, and a 3,600 square foot spa and fitness facility. The Debtor, including through a third-party manager, operates all aspects of the Hotel except for the restaurant, which is owned and operated by a third party under a lease of the restaurant space from the Debtor.

B. **Debt Structure.**

In 2006, the Debtor refinanced its debt on the Hotel through a loan (the "Loan") from Greenwich Capital Financial Products, Inc., which was evidenced by a promissory note in the amount of $12,000,000, payable over a period of five (5) years, and coming due in full in March 2011. The Debtor is informed, but has not confirmed, that the Loan was subsequently bundled with other loans and sold as part of a commercial mortgage-backed security to Greenwich Capital Commercial Funding Corp. GCCFC 2006-GG7 Los Gatos Lodging Limited Partnership ("Lender") claims that it currently holds the Loan, which is serviced by LNR Partners, LLC ("LNR"). Bank of

America, NA acts as trustee for the registered holders of the Loan. As of the petition date, the principal balance of the Loan had been reduced to $11,606,981. In addition, LNR has claimed that penalties and interest in arrears total approximately $1,500,000. The Loan is allegedly secured by substantially all of the Debtor's assets, including the real property on which the Hotel operates (the "Real Property").

### C. Events Precipitating the Debtor's Chapter 11 Case.

From its inception in 2002, the Hotel thrived and was quickly established as one of the premier hotels in the greater Los Gatos area. However, in 2008, after six years of successful operations, the Hotel's revenues declined precipitously due to the national economic crisis, and in particular the collapse of the real estate and credit markets in 2008. In fact, the Hotel's revenues declined by approximately 30% between 2007 and 2009, from $5.2 million to $3.6 million. As operating losses mounted, the Debtor's shareholders injected cash to service the Loan and to meet operating expense obligations. This additional capital, however, proved insufficient to meet the Hotel's cash flow requirements.

In September 2009, the Debtor requested that LNR grant a temporary modification of its Loan. The Debtor did not receive a response until July 29, 2010, when LNR provided the Debtor with a draft forbearance agreement. Although the Debtor promptly provided feedback on the forbearance agreement and responded to LNR's inquiries, the Debtor was met with a general lack of responsiveness and the forbearance agreement was never executed. Instead, LNR filed a Notice of Default and scheduled a trustee's sale of the Real Property for December 7, 2010. That sale has since been rescheduled for January 31, 2011. Due in large part to the impending foreclosure, the Debtor commenced this chapter 11 case to protect the value of its assets for the Debtor's creditors and equity holders.

### D. Outlook for the Future

The Debtor's financial and operating performance has improved dramatically in the last year and the Hotel has both increased revenues and decreased expenses since May 2010. The Debtor believes revenues in 2011 will exceed $4.4 million and generate gross operating income sufficient to pay all operating expenses. In addition, Lender holds cash reserves under the Loan (which are

property of the estate) of more than $732,000 for future property taxes, commercial insurance, and capital expenditures. Based on its recent and projected financial performance, the Debtor has formulated a strategic plan which will pay creditors in full and preserve the value of the Hotel for the Debtor's equity holders.

**E.     The Debtor's Utilities.**

The Debtor receives utility services, including electricity, natural gas, water, internet communications, telephone, television, and other utility services, from six (6) companies. A complete list of the Debtor's utility providers (collectively, the "Utilities") is attached as Exhibit 1 to the Declaration of Jeff Curran in support of the Motion.

Prepetition, the Debtor has generally paid the Utilities on a timely basis, although there are outstanding prepetition amounts owed to the Utilities because the Debtor commenced its case in the middle of the Utilities' billing cycles. As of the petition date, the Debtor had approximately $210,000 in operating cash, and anticipates that it will generate positive cash flow through the continued operation of the Hotel. Therefore, the Debtor should have adequate funds available to make payments to the Utilities on a timely basis.

Uninterrupted utility services are essential to the success of the Debtor's reorganization. Without utility services, including water, electricity, gas, telephone, internet and television, the Debtor cannot accommodate the needs of the guests and other patrons of the Hotel. Therefore, if one or more of the Utilities were to discontinue service for even a short period, revenues would be affected dramatically and the Debtor's ability to reorganize would be severely hampered.

**F.     The Adequate Assurance Procedures.**

To provide adequate assurance of payment for future services to its utility providers, the Debtor will deposit the estimated cost of monthly utility consumption from utilities other than Pacific Gas and Electric Company, *i.e.*, $8,034, into an interest-bearing segregated account (the "Utility Deposit Account").[1] This payment will be made within seven days after the entry of an order (the "Order") granting the Motion for the purpose of providing the Utilities with adequate

---

[1] PG&E is currently holding a $39,550 deposit paid by the Debtor. As PG&E's charges for gas and electricity services average $15,600 per month, PG&E has the requisite adequate assurance and the Debtor will not deposit additional funds into the Utility Deposit Account on account of PG&E.

assurance of payment for post-petition services. The Debtor will serve the Order and a notice of the amount deposited into the Utility Deposit Account on the Utilities within seven days of entry of the order.

In addition, the Debtor proposes the following procedures (the "Adequate Assurance Procedures") by which the Utilities may request additional adequate assurance in the event that a Utility believes the Utility Deposit Account does not provide satisfactory adequate assurance:

1. Within seven days from the date of service of the Order, any Utility may file and serve on the Debtor's proposed bankruptcy counsel[2] a specific request for additional adequate assurance, including the reasons why the deposit in the Utility Deposit Account does not constitute satisfactory adequate assurance of payment and a proposal for what would constitute satisfactory adequate assurance.
2. If a Utility makes a timely request for additional adequate assurance that the Debtor believes is reasonable, then the Debtor shall be authorized, but not required, to comply with the Utility's request without further order of the Court.
3. If the Debtor believes the request for additional adequate assurance is unreasonable, the Debtor will schedule a hearing to determine if additional adequate assurance is necessary.
4. Prior to the issuance of a court order requiring the Debtor to provide additional adequate assurance, the Utilities are deemed to have adequate assurance of payment and are prohibited from altering, refusing or discontinuing service to the Debtor.

## III.
## JURISDICTION

The Court has jurisdiction to consider and determine the Motion pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue before this Court is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

---

[2] Mintz Levin Cohn Ferris Glovsky and Popeo, P.C., attn: Abigail V. O'Brient, 3580 Carmel Mountain Road, Suite 300, San Diego, CA 92130.

Case: 10-63135    Doc# 34    Filed: 01/07/11    Entered: 01/07/11 15:30:35    Page 5 of 8

# IV.
## RELIEF REQUESTED

The Debtor seeks entry of an emergency order by this Court, pursuant to sections 105(a) and 366 of the Bankruptcy Code, (1) prohibiting the Utilities from altering, refusing or discontinuing postpetition utility services, (2) finding that the Utility Deposit Account constitutes adequate assurance of payment, subject to a Utility's right to seek modification of the proposed amount pursuant to the Adequate Assurance Procedures and (3) approving the Adequate Assurance Procedures.

# V.
## ARGUMENT

**A.  The Relief Requested is Appropriate under Section 366 of the Bankruptcy Code.**

Section 366 of the Bankruptcy Code prohibits utility providers from terminating services to a debtor for the first twenty days after it commences a bankruptcy case. However, in a chapter 11 case, the utility may subsequently alter, refuse or discontinue service unless the debtor furnishes satisfactory adequate assurance of payment for postpetition services within thirty days of the petition date. 11 U.S.C. § 366(c)(2). Therefore, section 366 both protects utility companies from the risk of nonpayment for postpetition services and shields debtors from utility service cutoffs. *See* H.R. Rep. No. 95-595 at 350 (1977).

Section 366 specifies that adequate assurance of payment may be provided through: "(i) a cash deposit; (ii) a letter of credit; (iii) a certificate of deposit; (iv) a surety bond; (v) a prepayment of utility consumption; or (vi) another form of security that is mutually agreed on between the utility and the debtor or the trustee." 11 U.S.C. § 366(c)(1)(A). However, the statute leaves the amount of assurance to the discretion of the court. 11 U.S.C. § 366(c)(3)(A) ("the court may order modification of the amount of an assurance of payment under paragraph (2).")

In exercising this discretion, the court should examine the totality of the circumstances in determining whether the risk of nonpayment is unreasonable. *In re Adelphia Business Solutions, Inc.*, 280 B.R. 63, 67 (Bankr. S.D.N.Y. 2002). In addition, the court should consider conflicting demands upon the debtor's limited resources. *See Va. Elec. & Power Co. v. Caldor, Inc.-NY*,

-6-

117 F.3d 646, 650 (2d Cir. 1997) (court should "focus upon the need of the utility for assurance, and [] require that the debtor supply *no more than that*, since the debtor almost perforce has a conflicting need to conserve scarce financial resources.")

The purpose of the adequate assurance requirement is not to guarantee full payment to a utility. Instead, the protection granted to a utility is intended to avoid exposing the utility to an unreasonable risk of non-payment. *See, e.g., In re Adelphia Business Solutions, Inc.*, 280 B.R. at 80. In weighing the utility's right not to be exposed to an unreasonable risk of nonpayment with the debtor's need to preserve scarce resources, courts have noted that the "amount of security deposit should bear a reasonable relationship to expected or anticipated utility consumption by a debtor." *In re Coastal Dry Dock & Repair Corp.*, 62 B.R. 879, 883 (Bankr. E.D.N.Y. 1986). Courts have previously held that a deposit equal to one month's worth of service provides adequate assurance to utility providers. *Id.* at 883-84.

Here, the Debtor proposes to establish the Utility Deposit Account containing one month's estimated utility expenses in order to provide adequate assurance to its utility providers. Courts have held that a deposit of this size provides adequate assurance. *Id.* In addition, the Debtor has provided procedures for a Utility to seek modification of this proposed deposit. Taken together, these measures, along with the Debtor's current cash on hand and revenues from continued operation of the Hotel, constitute adequate assurance of payment under section 366. As a result, the Utilities will not be exposed to an unreasonable risk of non-payment, and if a Utility believes it is subject to such a risk, it may use the procedures detailed above to request additional adequate assurance. Therefore, the Utility Deposit Account, coupled with the Adequate Assurance Procedures, provide the Utilities with adequate assurance.

## VI.

## NOTICE

The Debtor will serve the Motion, this Memorandum of Points and Authorities, and the Curran Declaration on (1) the United States Trustee, (2) the Debtor's twenty largest unsecured creditors, (3) Lender, (4) each of the Utilities, and (5) all parties requesting special notice by email, facsimile or overnight mail. Upon the Court's entry of an order setting hearing on the Motion, the

Debtor will serve that order on the parties listed above in accordance with the terms of the order setting hearing. The Debtor will serve the Court's Order on the Motion on each of the parties listed above.

## VII.

## CONCLUSION

WHEREFORE, the Debtor respectfully requests that the Court enter an order granting the relief requested herein, and granting such other and further relief as is just and proper.

DATED: January 7, 2011    /s/ Abigail V. O'Brient
Jeffry A. Davis
Joseph R. Dunn
Abigail V. O'Brient
Mintz Levin Cohn Ferris Glovsky and Popeo, P.C.

Proposed Attorneys for Debtor in Possession
Los Gatos Hotel Corporation